Filed 5/22/24  P. v. Rodas CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DOMINGO RODAS,<br><br>    Defendant and Appellant. | B326555<br><br>(Los Angeles County<br>Super. Ct. No. BA360125) |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Clay Jacke II, Judge.  Affirmed.

Aurora Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez and Nicholas

Webster, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

A jury convicted defendant Domingo Rodas of one count of first degree murder and two counts of willful, deliberate, and premeditated attempted murder. On appeal, Rodas contends his counsel provided ineffective assistance by failing to introduce evidence of his mental health history. Rodas also argues the trial court erroneously admitted testimonial hearsay relating to the murder victim's autopsy. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

One afternoon in August 2009, Ashli Hughes was hanging posters outside the Music Box Theater, where she worked. Around 1:30 p.m., Hughes saw Rodas "lurking" outside the theater. She also saw a homeless man she knew as Keith, later identified as Keith Falin, sleeping on the ground nearby. Hughes went inside for five or 10 minutes. Footage from a nearby security camera showed that while Hughes was inside, Rodas approached Falin, kneeled down, and reached his arm toward Falin. When Hughes returned, she saw a commotion, blood on the ground, and fire department employees assessing Falin. Falin had been stabbed in the chest. He later died from his injuries.

Later that afternoon, Kenneth McFetridge was taking a nap against a wall about half a mile from the Music Box Theater. When he awoke, he felt severe pain in his chest and had difficulty breathing. His friend asked someone to call an ambulance. Paramedics discovered a puncture wound in McFetridge's chest.

Around 4:45 p.m., about a quarter mile from where McFetridge had been napping, Ronald Vaughan was walking from his storage unit to a bus stop. A man came up behind Vaughan as he was walking. The man abruptly turned and lunged at Vaughan's chest, then walked away. Vaughan initially thought the man had punched him, but then he noticed blood and realized he had been stabbed.

Around 4:50 p.m., Los Angeles Police Officer Michael Kim responded to a call about a "man down" near the Music Box Theater. After he arrived, Kim received a description of the suspect. Kim and his partner searched the area and soon spotted a man, Rodas, matching the suspect's description. They conducted an investigative stop and found a knife in a makeshift cardboard sheath in Rodas's sleeve.

Falin's DNA was found on the sheath and handle of the knife. McFetridge's DNA was found on the shirt Rodas was wearing when he was arrested. Police officers later showed Vaughan a six-pack photo lineup, and Vaughan identified Rodas as "closest" to the man who stabbed him.

### 2014 trial and subsequent appeal

In February 2012, a trial court found Rodas incompetent to stand trial based on two psychiatric assessments. (*People v. Rodas* (2018) 6 Cal.5th 219, 224 (*Rodas*).) He was admitted to Patton State Hospital for treatment in April 2012. (*Id.* at p. 225.) Rodas was transferred to Atascadero State Hospital in February 2013, and in May, the hospital's medical director certified Rodas as mentally competent. (*Id.* at pp. 225–226.) The same month, the trial court ruled Rodas was competent to stand trial. (*Id.* at p. 226.)

3

In March 2014, after jury selection and before opening statements, defense counsel informed the court she had developed a doubt as to Rodas's competence to stand trial. (*Rodas*, *supra*, 6 Cal.5th at p. 227.) The court addressed Rodas directly and, after a brief colloquy, determined he understood the charges and was willing to help counsel. (*Id*. at p. 229.) The trial proceeded. Rodas was convicted of both attempted murders and of murdering Falin.[1] (*Id*. at p. 230.)

Rodas appealed, arguing the trial court should have suspended proceedings when defense counsel raised a doubt about his competence. (*Rodas*, *supra*, 6 Cal.5th at p. 230.) The Court of Appeal affirmed, concluding counsel's doubts " 'did not necessarily constitute substantial evidence of defendant's incompetence.' " (*Ibid*.)

Our Supreme Court reversed. The court's opinion described Rodas's extensive mental health history. In 1974, when he was 19 and serving in the U.S. Army, Rodas was hospitalized for a psychiatric disorder. (*Rodas*, *supra*, 6 Cal.5th at p. 224.) He was later medically discharged from the Army based on a psychiatric disability. (*Ibid*.) Rodas was declared incompetent to stand trial in 1984 and 1986. (*Ibid*.) He regained competency and was convicted of burglary. (*Ibid*.) In 1988, at the end of his prison sentence for burglary, Rodas was confined at the Atascadero and Patton State Hospitals under a mental health conservatorship, where he was diagnosed with paranoid schizophrenia and schizoaffective disorder with substance abuse. (*Ibid*.)

---

[1]     Rodas was also charged with and acquitted of two other murders. (*Rodas*, *supra*, 6 Cal.5th at p. 230.)

4

As noted above, Rodas was assessed again in 2011 and 2012, declared incompetent in 2012, and restored to competency in 2013.  However, the clinical report supporting the certificate of mental competency cautioned that Rodas should remain on his psychiatric medication regimen to maintain competency.  (*Rodas*, *supra*, 6 Cal.5th at p. 226.)  In March 2014, when defense counsel expressed doubt about Rodas's competency, Rodas told the court he was no longer taking his medication.  (*Id.* at p. 229.)  In the context of this history, and the specific observations of Rodas's counsel suggesting his condition had deteriorated, our Supreme Court determined there was substantial evidence of mental incompetence.  The court concluded the trial court should have suspended proceedings and conducted a new formal competency inquiry.  (*Id.* at p. 232.)

### The 2022 trial

On remand, Rodas was retried for murdering Falin and attempting to murder McFetridge and Vaughan.

Deputy medical examiner Dr. Lisa Scheinin had conducted Falin's autopsy, but she retired before Rodas's second trial. Deputy medical examiner Dr. Vadims Poukens testified at the second trial regarding Falin's cause of death based on his review of the autopsy report.  Defense counsel initially objected to Dr. Poukens's testimony to the extent it relied on hearsay, such as notes, in the autopsy report.  However, the prosecutor explained the autopsy report was kept during the regular course of business, and defense counsel stated, "based on that representation I think that's fine."  The court permitted Dr. Poukens to testify, and defense counsel stated she would object as needed.

5

The People introduced one diagram from Falin's autopsy report with handwritten notations describing a stab wound to his chest, aorta, and lung, and seven photographs showing the injury. Dr. Poukens testified that, based on his analysis of the photographs, Falin had been stabbed once in the aorta and left lung. He opined Falin was killed by the stab wound, and that it was a homicide. Dr. Poukens testified that Dr. Scheinin estimated the wound was between five and seven inches deep. He also testified that the autopsy report indicated Dr. Scheinin searched for other potential causes of death. According to Dr. Poukens, the autopsy report reflected that Falin was "probably a smoker" and his liver was "slightly enlarged and fatty," but Dr. Poukens opined these factors did not contribute to Falin's death.

After the People rested, defense counsel informed the court, outside the presence of the jury, that Rodas planned to testify, against her recommendation. The court questioned Rodas, who confirmed he wished to testify. Defense counsel also stated that she recommended introducing a 44-page packet of mental health records covering a date range of 1986 to 1988, in lieu of "live mental health psychiatric testimony." Counsel explained: "I thought it would be relevant to have it admitted, and it is my client's desire not for me to. It is my client's desire that it not be admitted, and I respect that choice." The following colloquy then occurred:

> The Court: All right. Is that correct, sir, that you do not want your mental health records to come before the jury?
> [Rodas]: Yes. Yes, your honor.
> The Court: So with that understanding or with that request, you realize that your decision not to have them admitted you can't later say, well,

6

there was something in my mental health records that could have helped me -- in the event that you're convicted -- that could have helped me, but they weren't presented because you're the one that's saying don't present them. You understand what I'm saying?

[Rodas]: Yes, your honor.

The Court: So you can't say the failure to present them, your lawyer's failure to present them was her fault or an error in the case. Understood?

[Rodas]: Yes, your honor.

On direct examination, defense counsel asked Rodas if he recalled any incidents in August 2009, if he had ever been hospitalized for any mental illness, and if he had ever taken any medications to help with any mental illness. To each inquiry, Rodas responded: "No comment." The People did not cross-examine Rodas.

The jury convicted Rodas as charged. The trial court imposed a state prison sentence of 39 years to life, plus nine years. Rodas timely appealed.

## DISCUSSION

### I. Rodas Has Not Established Ineffective Assistance of Counsel

Rodas argues his trial counsel provided ineffective assistance by failing to introduce evidence of his mental health history. He contends this evidence could have cast doubt on whether he formed the requisite mental state for the charged crimes. We conclude Rodas has not established that his trial counsel's performance was deficient or that it prejudiced the defense.

7

The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee the right to the assistance of counsel in criminal prosecutions. The "proper standard for attorney performance is that of reasonably effective assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 424 [attorney must provide "reasonably competent assistance"].) An ineffective assistance claim "has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland*, at p. 687.)

"Where the record contains no explanation for the challenged representation, we will reject an ineffective assistance claim unless counsel was asked to explain his performance and failed to provide an explanation, or unless there simply could be no satisfactory explanation." (*People v. King* (2010) 183 Cal.App.4th 1281, 1299 (*King*); *People v. Ledesma* (1987) 43 Cal.3d 171, 218 (*Ledesma*).) " ' "In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." [Citation.]' [Citation.]" (*People v. Majors* (1998) 18 Cal.4th 385, 403 (*Majors*).)

8

"We review the legal question of whether defendant's constitutional rights were violated de novo." (*People v. Palmer* (2020) 49 Cal.App.5th 268, 280.)

In *People v. Lang* (1989) 49 Cal.3d 991 (*Lang*), abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, the California Supreme Court held defense counsel's failure to offer mitigation evidence at the penalty phase of a capital trial, in accordance with the defendant's wishes, was not deficient performance and could not form the basis of an ineffective assistance claim. Defense counsel had planned to call the defendant's grandmother as a witness during the penalty phase of the capital case, but did not do so at the defendant's request. (*Lang*, at p. 1029.)

On appeal, the defendant argued that in agreeing to his wishes, defense counsel rendered ineffective assistance. The court rejected this argument, reasoning that requiring defense counsel to present mitigating evidence over the defendant's objection "would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client." (*Lang*, *supra*, 49 Cal.3d at p. 1031.) The court further explained that "[w]hile selection of defense witnesses is generally a matter of trial tactics over which the attorney, rather than the client, has ultimate control [citation], it does not necessarily follow that an attorney acts incompetently in honoring a client's request not to present certain evidence for nontactical reasons. . . . Given the attorney's ethical duty of loyalty to the client, it is 'not outside the range of competent attorney actions to fail to present mitigating evidence when the

9

defendant adamantly endorses that position.' [Citation.]" (*Ibid*.; accord, *People v. Brown* (2014) 59 Cal.4th 86, 112–113.)

The court alternatively concluded that even if defense counsel acted improperly, the invited error doctrine "estop[ped] a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own request[s]." (*Lang*, *supra*, 49 Cal.3d at p. 1032.) Similarly, in *Majors*, *supra*, 18 Cal.4th at page 409, the court applied the *Lang* analysis in rejecting the defendant's argument that defense counsel was ineffective for deferring to the defendant's request during the guilt phase of the trial that counsel *not* request a jury instruction on a lesser related offense.

Considering the reasoning of *Lang*, we disagree that the record indicates there could be no satisfactory explanation for counsel's failure to introduce into evidence the packet of mental health related records, over Rodas's objection. Defense counsel did not state that she was merely deferring to Rodas's wishes. She said only that she "respect[ed]" Rodas's choice to not present the packet of records. While counsel indicated she believed the documents were relevant, the record before us does not establish how significant they would have been since they did not appear to directly speak to Rodas's mental health in 2009. As in *People v. Haskett* (1982) 30 Cal.3d 841, 853, "defense counsel was aware of defendant's reluctance to call into question his own mental stability, and could have concluded that [she] would have difficulty securing defendant's cooperation" if she proceeded with offering the documents as evidence. The record further does not indicate why the defense did not introduce other evidence relevant to Rodas's mental state in 2009. We cannot discern from the record what other evidence was available, what the nature of

10

that evidence may have been, or whether counsel's decision not to introduce such evidence was erroneous.

We find the *Lang* court's reasoning applicable here that, given counsel's ethical duty of loyalty to her client, and in light of the absence of a record establishing the probative value of the packet of documents, we cannot determine that it was outside the range of competent attorney actions to fail to present the evidence over Rodas's objection, even if it was for a nontactical reason. Further, as in *Lang*, Rodas expressly informed the court that he was directing his attorney not to present the documents. He is therefore estopped from now claiming ineffective assistance on that ground.

On appeal, Rodas contends *Lang* is inapplicable because the court's analysis is limited to mitigation evidence in the penalty phase of capital cases and the discussion of the invited error doctrine is dicta this court should reject. (Cf. *People v. Poore* (2022) 13 Cal.5th 266, 311–312 (conc. opn. of Liu, J.) [suggesting *Lang* may be in tension with discussion in *McCoy v. Louisiana* (2018) 584 U.S. 414, regarding the division of roles between counsel and defendant].) However, even if Rodas's trial counsel's performance was deficient and the invited error doctrine does not apply, Rodas's ineffective assistance claim still fails because he has not established prejudice.

A defendant claiming ineffective assistance must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland, supra*, 466 U.S. at p. 687.) "[P]rejudice must be affirmatively proved. [Citations.] 'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show

11

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*Ledesma*, *supra*, 43 Cal.3d at pp. 217–218.)

Rodas has not met this threshold. The only specific evidence the record shows Rodas's counsel withheld was "a 44-page packet entitled mental health records . . . ranging in time from 1986 to 1988." Yet, this packet is not included in the appellate record, and Rodas has not presented any evidence as to what facts were reflected in it. Even if we assume the packet described Rodas's mental health diagnoses and history through 1988 (*Rodas, supra*, 6 Cal.5th at p. 230), Rodas fails to explain how the packet of records, if admitted, would have conceivably affected the outcome of the proceeding. The record suggests the information contained in the materials ended in 1988, two decades before Rodas was alleged to have committed the acts at issue in this case. During those two decades, it appears Rodas received some mental health treatment, and there is no indication in the record that the packet included information about the status of Rodas's mental health in August 2009. Rodas has not carried "his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

## II. Rodas Has Not Established Reversible Error Based on Violation of His Sixth Amendment Confrontation Right

Rodas also contends the trial court erred in admitting hearsay in certain autopsy materials and Dr. Poukens's

12

testimony based on those materials.  He argues this evidence violated his Sixth Amendment confrontation right because the autopsy report included Dr. Scheinin's hearsay statements.  We disagree.[2]

"[A] hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true.  Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*).) Separately, the Sixth Amendment guarantees the accused "the 'right . . . to be confronted with the witnesses against him' . . . ." (*Crawford v. Washington* (2004) 541 U.S. 36, 54 (*Crawford*).)

"In light of our hearsay rules and *Crawford*, a court addressing the admissibility of out-of-court statements must engage in a two-step analysis.  The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception?"  (*Sanchez, supra*, 63 Cal.4th at p. 680.)  If the statement is hearsay, the second step examines

---

[2]     The People argue Rodas forfeited any such claim because his counsel failed to expressly make a confrontation clause objection at trial.  (*People v. Redd* (2010) 48 Cal.4th 691, 730.) However, before the challenged testimony was offered, Rodas's counsel objected on hearsay grounds because Dr. Poukens did not create the diagram or compile the notes in the autopsy report. Rodas's "challenge on appeal is merely a constitutional 'gloss' upon an objection raised below, and therefore is not forfeited." (*People v. Foster* (2010) 50 Cal.4th 1301, 1322, fn. 9.)  To the extent Rodas arguably forfeited the hearsay arguments he raises on appeal by failing to object further during the testimony, we exercise our discretion to consider the arguments.

whether it "is *testimonial hearsay*, as the high court defines that term." (*Ibid*.) Testimonial hearsay has "two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619.)

The introduction of testimonial hearsay violates a defendant's confrontation right under the Sixth Amendment except under certain conditions that do not exist here. (*People v. Garton* (2018) 4 Cal.5th 485, 505 (*Garton*).)[3] "Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless." (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

We begin by assessing whether the evidence Rodas challenges constituted hearsay. (*Sanchez*, *supra*, 63 Cal.4th at p. 680.) The challenged evidence is: (1) photographs from the autopsy report depicting Falin's injuries; (2) a diagram from the autopsy report including Dr. Scheinin's handwritten notes; (3) Dr. Poukens's testimony based on the autopsy report; and

---

[3]     *Crawford* "bars the introduction of testimonial out-of-court statements offered for their truth unless (1) there is a showing that the declarant is unavailable and either (2) the defendant had a prior opportunity to cross-examine the declarant or (3) the defendant has forfeited his right to object through his own wrongdoing." (*Garton, supra*, 4 Cal.5th at p. 505.) The People made no showing below, and do not argue on appeal, that Dr. Scheinin was unavailable for the second trial.

14

(4) Dr. Poukens's testimony conveying Dr. Scheinin's out-of-court statements from the autopsy report.

" 'It is clear that the admission of autopsy *photographs . . .* does not violate the confrontation clause. Hearsay is defined as an out-of-court "statement." (Evid. Code, § 1200.) A statement is defined for this purpose as an "oral or written verbal expression or . . . nonverbal conduct *of a person*" intended as a substitute for oral or written expression. (Evid. Code, § 225, italics added.) Only people can make hearsay statements; machines cannot. [Citation.]' [Citation.]" (*Garton, supra,* 4 Cal.5th at p. 506.) The seven photographs from the autopsy report introduced at trial were not hearsay.[4]

Dr. Poukens's testimony relating his own opinions based on his review of the autopsy report was also not hearsay. We agree with the People that *Garton, supra,* 4 Cal.5th 485, is on all fours with this case, and Rodas fails to distinguish it in his briefing. In *Garton,* as here, the coroner who conducted an autopsy retired before trial. (*Id.* at p. 504.) The coroner's successor testified and provided opinions as to the cause of death based on the autopsy report. (*Ibid.*) On appeal, our Supreme Court held that a testifying coroner may rely on an autopsy report prepared by another person so long as the coroner does not relate as true any specific out-of-court statements. (*Id.* at p. 506.) The *Garton* court concluded it was clear that the testifying coroner "was exercising her own independent judgment to arrive at her conclusions." (*Id.*

---

[4] Rodas also argues the People did not establish an adequate foundation for the photographs. However, his counsel failed to object to the photographs on this basis at trial, and thereby forfeited the issue on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756; Evid. Code, § 353.)

15

at p. 507.)  Likewise, here, Dr. Poukens permissibly relied on Dr. Scheinin's autopsy report, and properly formed his own independent conclusions based on the report.  As in *Garton*, these statements were not hearsay.  (*Ibid*.)

The remaining two pieces of challenged evidence contained hearsay.  The diagram from the autopsy report showed the outline of a body and included handwritten notes stating: "2 – LUNG [¶] 1 – TO AORTA [¶] LT-RT, FRT TO BACK, DOWN. [¶] 5" DEEP TO 7" [¶] 1 ENTRY [¶] 2 WOUNDS TO LT LUNG [¶] TOP WOUND 3"-4" [¶] LOWER 5"-7" TWRS AORTA."  The handwritten statements were made out of court and the People have not identified any nonhearsay purpose for the statements.  Similarly, Dr. Poukens's testimony about Dr. Scheinin's estimate of the wound depth and her examination of the body also related hearsay statements.  (*Sanchez*, *supra*, 63 Cal.4th at p. 674.)

Yet, even assuming these statements were testimonial hearsay, any error in admitting them was harmless beyond a reasonable doubt.  *Garton* again provides useful guidance.  There, the testifying coroner conveyed several out-of-court statements from the autopsy report regarding the state of the victim's body and the manner of death.  (*Garton*, *supra*, 4 Cal.5th at p. 507.)  Our Supreme Court concluded that even if these out-of-court statements were testimonial, reversal was not required.  (*Ibid*.)  The court reasoned that the hearsay comprised a "relatively small portion" of the coroner's testimony, amounting to "only five or six statements out of testimony spanning 30 transcript pages . . . ."  (*Ibid*.)  Moreover, the hearsay was duplicative of other evidence independently establishing how the victim was killed, and the defense's closing argument conceded there was no

16

dispute as to the cause of death.  (*Ibid*.)  Any error was therefore harmless beyond a reasonable doubt.

Likewise, here, just two of Dr. Poukens's statements in 18 pages of testimony conveyed out-of-court statements.  Only one of the eight exhibits introduced from the autopsy report included hearsay.  Moreover, other evidence overwhelmingly established Falin's death was caused by a stab wound.  The autopsy photographs showed stab wounds to Falin's chest, aorta, and lung.  Dr. Poukens testified, based on his independent assessment of the evidence, that the cause of death was a stab wound to the chest.  He further testified Falin's smoking and fatty liver were not contributing factors, and that he could not identify any other contributing factor from the autopsy file.

As in *Garton*, Falin's cause of death was not disputed.  In closing argument, Rodas's trial counsel conceded someone killed Falin willfully and that he was stabbed.  The central issue for Rodas's defense was not the cause of death, but whether Rodas was the perpetrator and whether Falin was killed willfully, deliberately, and with premeditation, as required for first degree murder.  Under these circumstances, hearsay statements about the depth of the wound and whether other factors may have contributed to Falin's death did not "have high value in the overall evidentiary calculus."  (*People v. Caro* (2019) 7 Cal.5th 463, 493.)  Thus, even if the trial court erred in admitting this evidence, any error was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. at p. 24.)[5]

---

[5]     For the first time in his reply brief, Rodas argues he was prejudiced because without evidence of the depth of the wound, one or more jurors may have questioned his "intentions."  "We do

17

Finally, Rodas argues his counsel's failure to object during Dr. Poukens's testimony constitutes ineffective assistance of counsel.[6] We must reject this claim, as there is no evidence explaining counsel's rationale. (*King*, *supra*, 183 Cal.App.4th at p. 1299.) Indeed, " '[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) "In any event where, as here and as is typical, the appellate record has not provided counsel the opportunity to offer an explanation for his or her tactical choice, we affirm without prejudice to the defendant's right to litigate his claim in collateral proceedings in which counsel has the opportunity to offer an explanation for his or her tactical choice." (*People v. Arredondo* (2018) 21 Cal.App.5th 493, 502.)

---

not consider arguments raised for the first time in a reply brief." (*Committee to Relocate Marilyn v. City of Palm Springs* (2023) 88 Cal.App.5th 607, 636, fn. 8.) In any case, we would reject this argument, because other evidence, such as the fact that the knife penetrated so deeply as to reach Falin's lung and aorta, was equally probative of the perpetrator's "intentions."

[6] Rodas's trial counsel objected just once during Dr. Poukens's testimony, on the basis that he had no personal knowledge of the Los Angeles County coroner's office's practice of sending a different coroner to testify when the examining coroner has retired before trial. That practice is not at issue on appeal.

## DISPOSITION

The trial court judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.